UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA and the
STATE OF NEW YORK *ex rel.* Mary Ann Kingsley,

*Plaintiffs,*

*v.*

ROCHESTER GENERAL HEALTH SYSTEM and
INDEPENDENT LIVING FOR SENIORS, INC.
d/b/a ELDERONE,

*Defendants.*

QUI TAM COMPLAINT
AND
DEMAND FOR A JURY TRIAL

FILED UNDER SEAL
PURSUANT TO
31 U.S.C. §§ 3729 *et seq.*

Civil Action No.

_____

Relator Mary Ann Kingsley brings this action in the name of the United States of America and the State of New York, by and through her undersigned attorneys Thomas & Solomon LLP, and alleges as follows.

## INTRODUCTION

1.     This is a civil fraud action to recover damages and penalties on behalf of the United States of America and the State of New York (individually and collectively, the "Government") arising from false claims and statements made and presented by Rochester General Health System and Independent Living For Seniors d/b/a ElderONE (collectively, "Defendants") in violation of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, including its whistleblower provision, the New York State False Claims Act, N.Y. FIN. LAW §§ 187 *et seq.* ("NYSFCA") and the New York State Whistleblower Act, N.Y. LAB. LAW §§ 740 *et seq.*

2.     Defendants are health care service providers that participate in and receive reimbursement and other payments from programs funded by the Government, including

Medicaid and Medicare.

3.       In connection with Defendants' fostering and maintaining a culture of aggressive efforts to continually increase profits, Defendants have improperly and knowingly presented claims for payment to the Government that, upon information and belief, the Government would not have paid but for Defendants' false statements.

4.       The False Claims Act provides liability for any person (i) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" or who otherwise improperly makes false statements to the Government.  31 U.S.C. § 3729(a)(1)(A)-(G).  The False Claims Act further provides that any person who violates the Act "is liable to the United States Government for a civil penalty ... plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9).

5.       Under the FCA, liability attaches when a defendant submits or causes another to submit a claim for payment from Government funds that the defendant knows is unwarranted and when false records or statements are knowingly made or used for obtaining approval of a false or fraudulent claim for Government funds.  Liability also attaches under the FCA when a defendant knowingly makes, uses, or causes to be made, a false record or statement to conceal, avoid or decrease an obligation to pay to the Government.

6.       The FCA permits any person having information regarding a false or fraudulent claim for payment from Government funds to bring an action for herself as the Relator and for the Government and allow her to share in any recovery.

7.       Based on the foregoing provisions, as well as similar provisions of the

NYSFCA, Relator Kingsley asserts violations of Federal and State law in connection with false claims made by Defendants in connection with Medicare, Medicaid, and the Program of All-Inclusive Care for the Elderly ("PACE").

8.      Relator Kingsley seeks to recover all available damages, civil penalties, and all other relief available for expenditures impacted by Defendants' fraud, including treble damages and penalties under the FCA, the NYSFCA, and Federal and State whistleblower provisions.  Damages owed to the Government include, but are not limited to, the full value of all reimbursements pursuant to Government Programs that the Government would not have paid but for Defendants' false claims and certifications.

9.      Defendants' wrongful practices include improperly and knowingly submitting false claims for reimbursement to Medicare and Medicaid, including upcoding "UAS-NY" assessment forms improperly enroll non-qualifying individuals in Defendants' PACE program; upcoding OASIS forms to secure fraudulent payments from Medicare and Medicaid for home health services; and failing to provide service and care to patients in the PACE program.

10.      Defendants also improperly and knowingly presented claims for payment on the basis of false statements and on the basis of false certifications that Defendants were in compliance with applicable New York State and Federal standards.

11.      Upon information and belief, the Government would not have paid Defendants' claims had it been aware of the falsity of Defendants' claims and certifications.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732, conferring jurisdiction for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730, and

pursuant to 28 U.S.C. § 1331, conferring jurisdiction over all civil actions arising under the laws of the United States.

13.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the claims brought under New York law as those claims form part of the same case or controversy as the federal claims.

14.     Venue is proper in this District because Defendants can be found in and transact business in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by Defendants in this District.  Therefore, venue is proper within the meaning of 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a).

15.     Relator shall serve a copy of this Complaint upon the United States and the State of New York.  Relator will also serve upon the United States and the State of New York a written disclosure statement setting forth and enclosing all material evidence and information she possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

## THE PARTIES

16.     The plaintiffs in this action are the United States, through its agency the United States Department of Health and Human Services, and the State of New York, through its agency the New York State Department of Health.

17.     Relator Mary Ann Kingsley is a resident of Fairport, New York.  From approximately August 30, 2010 to January 29, 2014, Relator was employed by Defendants as a Nurse Manager for Defendants' home care service, ElderONE.

18.     Relator Kingsley is an original source of the allegations contained in this Complaint.

19.     Defendant Rochester General Health System ("RGHS") is a nonprofit

health care system that includes Rochester General Hospital, ElderONE Newark-Wayne Community Hospital, DeMay Living Center, Hill Haven Assisted Living, Behavioral Health Network, and the Rochester General Medical Group.  RGHS has a principal place of business of 1425 Portland Avenue, Rochester, New York 14621.

20.      Upon information and belief, Defendant RGHS operated the home health care component of its health care services as Independent Living for Seniors, Inc.

21.      Defendant Independent Living for Seniors, Inc. ("ILS") d/b/a ElderONE is a New York Corporation which provides home health care services.  Defendant ILS has a principal place of business of 1425 Portland Avenue, Rochester, New York 14621.

22.      As of approximately November 2013, Independent Living for Seniors, Inc. was renamed ElderONE.  ElderONE continues to be an affiliate of Rochester General Health System.  ElderONE currently operates as a PACE program providing elderly patients with home health care services.

23.      According to its website, ElderONE has a principal place of 2066 Hudson Avenue, Rochester, New York 14617.

24.      Upon information and belief, ElderONE is recognized as a licensed home health care agency by the New York State Department of Health.

## LEGAL BACKGROUND

25.      The United States' claims against Defendants under the FCA are based upon false certifications and false or fraudulent claims that Defendants presented or caused to be presented to Medicare and Medicaid in order to obtain millions of dollars in reimbursements.  These claims to Medicare and Medicaid were false or fraudulent in that they requested payment for home health services that were not medically necessary, did not

meet the Medicare or Medicaid rules for compensable home health services, and/or requested payment for home health services in an amount that had been knowingly and falsely inflated.

26.      Thus, Defendants have systematically violated proper procedures as well as Federal and State regulatory requirements.   Furthermore, Defendants have implemented practices and procedures that have compromised patient safety and outcomes and also violated State and Federal law and regulations.

27.      As a result of this culture, Defendants have submitted false claims and/or certifications to the Government in connection with the Medicare and Medicaid programs.

***Medicaid***

28.      Defendants routinely apply for, and receive, reimbursement in connection with Medicaid.

29.      Medicaid, a health insurance program created by Title XIX of the Social Security Act of 1965, authorizes grants to States for medical assistance to children, blind, aged and disabled individuals whose income and resources are not sufficient to meet the costs of necessary medical care.  42 U.S.C. § 1396; 42 C.F.R. § 430.0; *see also* 42 U.S.C. §§ 1396-1396v.  Thus, Medicaid primarily benefits people and families with low incomes and disabled individuals.  Medicaid is a means-tested program that is jointly funded by the States and the Federal Government and is managed by the States. The amount of Federal funding in a State's program is determined by a statutory formula set forth in 42 U.S.C. §§ 1396b(a) and 1396d(b).

30.      Upon information and belief, Medicaid provides health care coverage for approximately 53 million people. Each State administers its own Medicaid program while CMS monitors the State-run programs and establishes requirements for service delivery,

quality, funding and eligibility standards. States provide up to half of the funding for the Medicaid program.

31.     A State that elects to participate in Medicaid must establish a plan for providing medical assistance to qualified beneficiaries. 42 U .S.C. § 1396a(a)-(b); *see also* 42 C.F.R. Part 430, Subparts A and B; CMS State Medicaid Manual § 13025. In exchange, the Federal Government, through CMS, pays to each participating State the Federal portion of the expenditures made by the participating State to providers and ensures that the States comply with minimum standards in the administration of Medicaid. 42 U.S.C. §§ 1396, 1396a, and 1396b.

32.     The State of New York has elected to participate in Medicaid, has established a State plan under Medicaid and has promulgated regulations that implement the State plan. N.Y. Soc. Serv. L. §§ 363 *et. seq.*; 10 N.Y.C.R.R. Parts 85-86; 18 N.Y.C.R.R. Part 360.  The New York State Department of Health (hereinafter "NYSDOH") is the sole Medicaid agency that has contracted with HHS to administer or supervise Medicaid in New York State.  N.Y. Pub. Health L. § 201.1(v); *see also* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(b).

33.     Federal Medicaid law does not set precise requirements and States are free to set payment rates.  Individuals or entities that provide services to Medicaid beneficiaries in New York submit claims for payment to NYSDOH or its local delegate agency. 42 C .F.R. § 430.0.  Payments are made based on types and ranges of services, payment levels for services and administrative and operating procedures established by the State in accordance with Federal laws, statutes and rules. *Id.*

34.     In New York, a provider that treats Medicaid beneficiaries may only submit

claims for reimbursement for services that have been provided in compliance with Title 18 of

the New York Code of Rules and Regulations. 18 N.Y.C.R.R. § 504.6(d). By enrolling in the

New York State Medicaid program, a provider agrees to comply with the rules, regulations

and official directives of NYSDOH. 18 N.Y.C.R.R. § 504.3(i).

> 35.     18 N.Y.C.R.R. § 515.2 provides, in pertinent part:

> (a) Unacceptable practices under the medical assistance program. (1) . . . conduct by a person which is contrary to the official rules and regulations of [NYSDOH]; (2) . . . conduct by a person which is contrary to the published fees, rates, claiming instructions or procedures of [NYSDOH]; (4) . . . conduct by a person which is contrary to the regulations of [HHS] promulgated under [Title XIX]; (b) Conduct included. An unacceptable practice is conduct which constitutes fraud or abuse and includes the practices specifically enumerated in this subdivision. (1) False claims: (i) Submitting, or causing to be submitted, a claim or claims for unfurnished medical care, services or supplies; (2) False statements: (i) making or causing to be made any false, fictitious or fraudulent statement or misrepresentation of material fact in claiming a medical assistance payment. or for use in determining the right to payment; (3) Failure to disclose: Having knowledge of any event affecting the right to payment of any person and concealing or failing to disclose the event with the intention that a payment be made when not authorized, or in a greater amount than due.

> 36.     Federal regulations are also strict with regard to Medicaid fraud, abuse and

waste. Payments to providers are permitted only for provider practices consistent with sound

fiscal, business, or medical practices, or for services that are medically necessary and meet

professionally recognized standards for health care. 42 U.S.C. § 1396(a); 42 C.F.R. § 433(f)

(§§ 433.300, *et seq.*); 42 C.F.R. § 455.2.

> 37.     At all time relevant hereto, Defendants were required to and did submit an

enrollment application to participate in the New York State Medicaid Program.

> 38.     At all times relevant hereto, Defendants were required to and did submit

along with such applications a certification that it would comply with all DOH and Medicaid

regulations, as well as impliedly certifying compliance with such regulations by submitting

claims for reimbursements.

*Medicare*

39.     Defendants routinely apply for, and receive, reimbursement in connection with Medicare.

40.     Medicare is a federally funded program established pursuant to Title XVIII of the Federal Social Security Act, 42 U.S.C. § 1395, *et seq.*, that pays for medical benefits for "aged and disabled" individuals. Under Medicare, health care providers submit claims for reimbursement of payment directly to the Federal Government.

41.     The Government prescribes the procedures and processes by which Defendants may receive reimbursement for care provided to beneficiaries of Medicare and Medicaid.  Defendants must follow detailed regulations, procedures and instructions to obtain reimbursement for claims made under Medicare and Medicaid.  Additionally, upon each request for reimbursement, Defendants must certify that the request and all supporting documentation are true, correct, complete and prepared from Defendants' books and records in accordance with applicable instructions and requirements, unless expressly noted otherwise.  Neither concealment nor silence regarding a provider's right to reimbursement is permissible.

42.     Providers who discover material errors or omissions in claims submitted for reimbursement under Medicare are required to disclose those matters.  Accordingly, providers have an affirmative duty to disclose material information that indicates their reimbursement claims are inaccurate.

43.     Here, however, Defendants have failed to comply with these requirements and have improperly and knowingly submitted claims under Medicare for services that are

not eligible for reimbursement, including those described below.

*Medicaid and Medicare Payment for PACE Services*

44.     Upon information and belief, individuals who are eligible for Medicare and Medicaid may voluntarily enroll in a PACE program.   Medicare, which provides health coverage for all individuals over age 65, will pay a share of the capitated payment for Medicare-eligible patients.   Likewise, Medicaid will pay a share of the capitated payment for those individuals who qualify on low income grounds.   Anyone otherwise eligible for PACE who is not covered by Medicaid can pay the difference out of pocket.

45.     Under the PACE program, the New York State Department of Health makes a prospective monthly payment to PACE organizations for a capitation amount for each Medicaid participant in the PACE program.   42 C.F.R. § 460.182.

46.     Under the PACE program, CMS makes a prospective monthly payment to PACE organizations for a capitation amount for each Medicare participant in a payment area based on the rate it pays to a Medicare Advantage organization.   42 C.F.R. § 460.180.

47.     Before an individual may enroll in the PACE program, the PACE organization must assure that a PACE applicant is eligible to enroll in the PACE program.   42 C.F.R. § 460.150(a).

48.     Additionally, every six months the PACE program must verify that the participant continues to meet the nursing level of care criteria as specified in 42 CFR 460.160(b).

49.     In order to enroll in PACE, an individual must: (1) be 55 years of age or older; (2) be determined by the State administering agency to need the level of care required under the State Medicaid plan for coverage of nursing facility services; (3) reside in the

service area of the PACE program; and (4) meet any additional program specific eligibility conditions imposed under the PACE program agreement.

50.        Pursuant to 18 N.Y.C.R.R. § 505.23(a)(1)(i), the Department of Health will only pay for home health services under the Medicaid program only when those services are medically necessary.

51.        Additionally, it is a universal requirement of the Medicare payment program that all services provided must be reasonable and medically necessary.  42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1395y(a)(1)(I).  Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for profit of the provider.  *Id.*

## FACTUAL BACKGROUND

*Defendants' Home Health Care Programs*

52.        At all relevant times, Defendants provided home health care services to individuals in the Greater Rochester area.

53.        Upon information and belief, until approximately May 2013, Defendants operated as a Certified Home Health Agency ("CHHA") under the relevant New York State Department of Health regulations.

54.        Upon information and belief, since approximately May 2013, Defendants operated its home health care services as a Licensed Home Care Service Agency ("LHCSA") under the New York State Department of Health.

55.        Under both the CHHA and LHCSA schemes, home health care providers must provide periodic comprehensive assessments to patients to assess a patient's need for home care, medical, nursing, social, and discharge planning needs.

56.     As a CHHA, the assessment tool that Defendants used to assess home care patients for home care services was the Outcome and Assessment Information Set ("OASIS").

57.     As an LHCSA program, Defendants currently utilize the Uniform Assessment System created by New York State ("UAS-NY") to conduct comprehensive assessments of patients in PACE programs.

58.     Upon information and belief, the change from the OASIS assessment to the UAS-NY assessment was prompted by New York State's redesign of the Medicaid system. The UAS-NY is administered by the Office of Health Insurance Programs, Division of Long Term Care.  The overall goal of the UAS-NY is to utilize a comprehensive assessment system within eight Medicaid home and community-based long-term care services and programs. Depending on the UAS-NY assessment, patients are placed into the appropriate long-term care program that aligns with the patient's needs.

*Defendants' Systematically Engaged in a Scheme to Defraud Medicare and Medicaid*

59.     Defendants' promoted a culture of noncompliance designed to defraud Medicare and Medicaid.  Defendants continually pressured employees to defraud and falsely bill Medicare and Medicaid so that Defendants would receiver greater reimbursements from the government than they were actually entitled.

60.     As alleged below, Defendants' frauds entail multiple interrelated schemes that caused the overpayment of Medicare and Medicaid funds by the federal government in substantial amounts: (1) improperly upcoding UAS-NY assessment scores in order to obtain assessment scores that allowed Defendants to enroll ineligible patients in Defendants' PACE program; (2) improperly upcoding and manipulating OASIS patient assessment scores to obtain higher reimbursements from Medicare and Medicaid than Defendants were otherwise

-12-

entitled; and (3) Defendants failed to provide services to the PACE program enrollees, seriously jeopardizing the health and safety of such patients.

61.     Below, plaintiffs detail the major types of false claims and false statements made by Defendants.  The examples that follow are not, by far, an exhaustive list of the false statements and claims allegedly submitted by the Defendants.   Rather they are only illustrative of the efforts of concealment used by Defendants and the major types of costs submitted for reimbursement with the knowledge they were false.

*Upcoding of UAS-NY Forms to Enroll Ineligible Patients in Defendants' PACE Program*

62.     From approximately August 2013 to the present, Defendants knowingly schemed to defraud Medicare and Medicaid by falsely inflating UAS-NY Community Assessment forms in order to enroll otherwise ineligible patients in Defendants' PACE home health care service.

63.     42 U.S.C. § 1395eee establishes the Programs for All-Inclusive Care for the Elderly ("PACE"), which is an optional benefit under both Medicare and Medicaid.  CMS contracts with PACE organizations to provide comprehensive medical and social services to the elderly.  Additionally, PACE programs are required to offer the same items and services that are offered under Medicare.

64.     PACE programs are health care provider programs which provide comprehensive health care services to patients in the program.  These services include physician, nurse, home health aide, physical therapy, pharmacy, speech, social work, and even transportation services.

65.     In order to be eligible for a PACE program, an individual must live in a PACE service area, be at least 55 years of age, can have their health needs fulfilled in a

community setting, and is certified via a screening process as needing a nursing home level of care (as defined by a state's Medicaid plan).  42 C.F.R. § 460.152.

66.     At the beginning of each month, Medicare and Medicaid make a capitation payment to PACE organizations for the services provided to each PACE enrollee.  *See* 42 C.F.R. §§ 460.180, 460.182.

67.     The capitation payment, which is a large upfront payment each month, is designed to cover the comprehensive services offered to each patient.  PACE programs are therefore expected to use this money to care for their enrollees to prevent hospitalizations and nursing home admissions which are very expensive.

68.     Upon information and belief, the typical capitation payment that Defendants receive for each PACE enrollee is at least several thousand dollars per month. The exact payment for each enrollee depends on the acuity of each patient, whereby patients with more acute conditions will have a higher capitation amount each month.

69.     Upon information and belief, in order to provide PACE services, Defendants were required to enter into a PACE program participation agreement with CMS, and the state administrator of Medicaid, the New York State Department of Health, as required under 42 C.F.R. § 460.30.

70.     As prescribed by 42 C.F.R. § 460.32, the PACE program agreement that Defendants were required to enter into requires that Defendants meet all applicable requirements under Federal, State, and local laws.  42 C.F.R. § 460.32(a)(2).

71.     Upon information and belief, Defendants currently have approximately 495 individuals enrolled in the PACE program.

72.     In order to determine which individuals qualify for the PACE program,

New York State uses the UAS-NY assessment to determine if a patient is in need of a nursing home level of care.

73.     The UAS-NY is a web-based application that enables users to conduct a home and community-based long-term care assessment.

74.     The UAS-NY instrument allows a provider, typically a registered nurse, to assess multiple domains of a patient, including function, health, social support, and service. The UAS-NY is divided into two components, the functional supplement and the mental health supplement.  The functional supplement is designed to capture health information related to health, function, and support.  The mental health supplement is designed to capture information related to mental health service history, mental health, and social relations.

75.     Once an individual is assessed using the UAS-NY, the assessment uses a number of algorithms and formulas to provide a patient score that is used to guide long-term care planning.

76.     Upon information and belief, the scoring system that the New York State Department of Health uses in scoring individuals on the UAS-NY is called a "NFLOC" score. For instance, if a person scores a two on the UAS-NY, their score would be NFLOC2.

77.     Upon information and belief, the UAS-NY uses 22 items to generate the NFLOC score.  Some of the items that are assessed for the NFLOC score include cognitive skills (such as short term and procedural memory), mood and behavior (such as wandering, abuse, socially inappropriate behavior), functional status (such as bathing, dressing, locomotion, ability to use the toilet), and continence (both bladder and bowel).

78.     Upon information and belief, in order for an individual to be eligible to be

enrolled in the PACE program, the individual must receive an NFLOC score of at least five.

79.     Upon information and belief, when potential patients are screened for eligibility in the PACE program, Defendants send a registered nurse to conduct an in-depth assessment of the patient using the UAS-NY in the home of the patient. As discussed above, the patient must score an NFLOC of at least five to be eligible for Defendants' PACE program.

80.     Shortly after Defendants began to use the UAS-NY community assessment in July 2013, Defendants realized that the scoring on the UAS-NY was "off." When Relator Kingsley asked her manager, Sherry Glavin, what was meant by the scoring being "off," Relator Kingsley was told that patients were not scoring as severely on the UAS-NY as patients previously did using the OASIS assessment. As a result of patients being scored as having less severe clinical scores, Defendants were not receiving as much reimbursement as they had under the previous OASIS scoring system.

81.     Upon information and belief, as a result of seeing the scoring and payment discrepancies between the OASIS and UAS-NY assessments, Defendants decided to run a pilot survey to identify which questions on the UAS-NY assessment generated the most points. Sherry Glavin, the Director of Home Care for Defendants, was in charge of running this survey.

82.     Upon information and belief, Ms. Glavin determined that Defendants could increase their UAS-NY scores by answering certain questions in the affirmative. Specifically, Ms. Glavin found that UAS-NY scores could be increased by coding patients as incontinent and as having certain mental conditions, such as depression, anxiety, and suicidal thoughts.

83.     After she conducted the scoring survey, Ms. Glavin spoke to Relator Kingsley and Defendants' other PACE program managers about the scoring system.   This meeting occurred in approximately July 2013.   During this meeting, Ms. Glavin stated she discovered that coding patients as having urinary incontinence would automatically result in a UAS-NY NFLOC score of at least five.

84.     During this same meeting, Ms. Glavin told the nurse managers that all individuals assessed for PACE eligibility needed to be coded as having a NFLOC score of at least five in order to be enrolled.   Ms. Glavin further stated during this meeting that Defendants' nurses were to routinely code individuals as incontinent if they had an NFLOC score of less than five because that would allow Defendants to meet the PACE eligibility criteria.   Ms. Glavin stated that employees should fill out the UAS-NY this way because "everybody is incontinent at some point."

85.     Shortly after Defendants' began using the UAS-NY scoring system, Relator Kingsley received a phone call from Sherry Glavin regarding a nurse, Cherly Winchell, who had coded a potential PACE enrollee as having an NFLOC score of two.   During this phone call, Ms. Glavin asked Relator Kingsley, "how did this happen?"   Ms. Glavin further instructed Relator Kingsley that she needed to work with Ms. Winchell to ensure that this would not happen again and that patients needed to have a NFLOC score of at least five.

86.     During a subsequent UAS-NY rollout meeting, Ms. Glavin instructed the nursing staff that if they had patients who scored less than five, they needed to contact their manager.

87.     In order to get the UAS-NY scores to at least a five, Ms. Glavin discussed multiple ways in which certain UAS-NY questions should be upcoded.   As just a few

examples, Ms. Glavin stated that Defendants' nurses should upcode symptoms such as urinary incontinence, bowel incontinence, and the mental capacity questions on the UAS-NY form.  Defendants instructed that employees should "think outside the box" and "use your imagination" in order to provide answers that went against their medical judgment.

- As a specific example of where such upcoding occurred, Relator Kingsley was contacted by nurse Michelle Laraby on approximately January 27, 2014.  During this conversation, Ms. Laraby stated that she had a patient that originally had an NFLOC score of two the UAS-NY.  Subsequently, Ms. Laraby upcoded the patient, NB, as being incontinent despite the fact that the patient was a dialysis patient and therefore would not produce much urine and could not be coded as incontinent.  As a result of the urinary incontinence upcoding, NB was able to remain eligible in Defendants' PACE program.

88.      Relator Kingsley was repeatedly told by her nursing staff that their answers on the UAS-NY went against their medical judgment.  However, the nurses knew that if they did not score patients as having a score of five, they would face phone calls and backlash from Sherry Glavin as to why they did not upcode the questions as per her instructions.

89.      Defendants submission of claims for upcoded services were false and fraudulent, and violated PACE, Medicare, and Medicaid regulations.

90.      The false records or statements described herein were material to the false claims submitted or caused to be submitted by Defendants to PACE, Medicare, and Medicaid.

91.      In reliance upon Defendants' false statements and records, PACE, Medicare, and Medicaid paid false claims submitted by Defendants that it would not have paid if not for those false statements and records.

92.      The relator, Mary Ann Kingsley, had direct knowledge of these patterns of upcoding in her role as a nurse manager.

*Upcoding of OASIS Forms*

93.     From approximately at least August 2010 to approximately July 2013, Defendants knowingly schemed to defraud Medicare and Medicaid through the submission of fraudulent OASIS forms to Medicare and Medicaid that were falsely inflated or "upcoded" so that defendants would receive fraudulently higher reimbursements from the government.

94.     During this time, Defendants' nurses assessed patients using the OASIS assessment tool ("OASIS report"). The OASIS report is submitted along with nurses' notes and other paperwork to a manager, who is responsible for reviewing the data reflected in the OASIS form. The information is then sent to medical coders who are responsible for applying the appropriate codes to the claim for payment, based on the patient's clinical and functional status as reflected on the OASIS report.

95.     The amount of Medicare and Medicaid reimbursement that each CHHA receives is based on the severity of each home health care patient. The severity of a patient is scored by using the OASIS report. The OASIS report contains 25 pages of items of information related to the patient's acuity, enumerated as "M" questions.

96.     The OASIS assessment is then totaled to determine a point score and the corresponding reimbursement amount from Medicare and Medicaid. Generally speaking, the more severe a patient's physical ailments, the higher the point level, and the greater the reimbursement the CHHA receives from Medicare and Medicaid.

97.     Defendants systematically defrauded Medicare and Medicaid by falsifying records to obtain Medicare and Medicaid payments that were not justified by the patients' actual medical condition. Defendants pressured employees to disregard their own independent medical judgment and to instead manipulate the OASIS assessments so that

Defendants would fraudulently increase their Medicare and Medicaid reimbursements.

98.    As a just few examples, Defendants upcoded OASIS assessment questions relating to a patient's ability to prepare a meal, urinary incontinence, and bowel incontinence.

99.    Ms. Glavin told employees that they should code patients as having these symptoms because it allowed Defendants to raise their points scores on the OASIS, thereby allowing greater reimbursement from Medicare and Medicaid.

100.    In fact, as the OASIS assessment that Defendants used listed the point values for each "M question," Defendants repeatedly counseled employees on the importance of referring to the point values when making assessment decisions.

101.    At all times relevant to the Complaint, Defendants engaged in this pattern and practice of falsifying OASIS reports and other records in order to inflate its reimbursements from Medicare and Medicaid.

102.    As Defendants systematically complete falsified OASIS reports, Defendants received higher reimbursements from Medicare and Medicaid based on falsified assessment data that did not reflect the actual clinical status of their home care patients.

103.    Defendants made and used false OASIS patient assessment data that inaccurately reflected patient conditions or falsely emphasized conditions that were not part of the patients' legitimate home health needs.   In turn, the falsified scores resulted in improper PPS payment data submitted to the Government.

104.    Defendants submission of claims for upcoded services were false and fraudulent, and violated PACE, Medicare, and Medicaid regulations.

105.    The false records or statements described herein were material to the false

claims submitted or caused to be submitted by Defendants to PACE, Medicare, and Medicaid.

106.     In reliance upon Defendants' false statements and records, Medicare and Medicaid paid false claims submitted by Defendants that it would not have paid if not for those false statements and records.

107.     The relator, Mary Ann Kingsley, had direct knowledge of these patterns of upcoding in her role as a nurse manager.

*Fraudulent Billing for Services Never Provided*

108.     Defendants frequently billed Medicaid and Medicare for services purportedly provided to patients in the PACE program, but which were never or rarely provided.

109.     As discussed above, due to the capitation payment structure under the PACE program, Defendants were primarily concerned with enrolling as many patients as possible, regardless of whether those patients actually qualified for the PACE program under the UAS-NY assessment.

110.     As PACE programs only enroll patients that would otherwise require nursing home care, the patients are typically at risk for requiring extensive acute and nursing home care.  To prevent hospitalizations and nursing home care, PACE programs are designed to provide preventative services such as therapy services, exercise, and frequent check ups.

111.     Due to Defendants' efforts to enroll as many patients as possible, Defendants did not have the staffing necessary to carry such a high volume of patients.  As a result, Defendants enrolled patients in the PACE program, but simply did not have enough employees available to provide the home care services required under the patient treatment

plans.

112.　　The PACE program requires that Defendants provide all Medicare and Medicaid items and services. Pursuant to 42 C.F.R. § 460.40(a), CMS may impose sanctions if a PACE organization fails substantially to provide to a participant medically necessary items and services that are covered PACE services and the failure adversely affects the participant.

113.　　Upon information and belief, CMS denies Medicare and Medicaid payments to PACE organizations that fail to provide services to PACE program participants. 42 C.F.R. § 460.42(b).

114.　　Defendants failed to provide the necessary care and services to patients that were enrolled in the PACE program.

115.　　Among other things, Defendants failed: to adequately provide home care services to patients, to maintain adequate nursing, to fulfill the requirements of patient care plans, to maintain the basic hygiene of patients, and to prevent falls and bed sores.

116.　　As a nurse manager, Relator Kingsley received many calls from patients in the PACE program who were calling to complain that Defendants failed to provide home care visits.

117.　　Relator Kingsley is aware that despite the fact that some patients had care plans calling for daily home health aide visits, some patients were visited only once a week. In one instance, a patient AC, did not receive a home health visit over the course of a three week period.

118.　　As a result of Defendants' neglect and failure to provide home health services, one PACE program participant was seriously hospitalized after not receiving fluids.

In other instances, Relator Kingsley is aware that patients suffered falls in their homes and remained on the floor for hours because Defendants did not provide the home care visits as set out in the patients' care plans.

119.    Defendants submission of claims for services not provided were false and fraudulent, and violated PACE, Medicare, and Medicaid regulations.

120.    The false records or statements described herein were material to the false claims submitted or caused to be submitted by Defendants to PACE, Medicare, and Medicaid.

121.    In reliance upon Defendants' false statements and records, PACE, Medicare, and Medicaid paid false claims submitted by Defendants that it would not have paid if not for those false statements and records.

122.    The relator, Mary Ann Kingsley, had direct knowledge that Defendants failed to provide services to PACE program participants.

## FIRST CLAIM

### Violations of the False Claims Act: Making or Using a False Record or Statement (31 U.S.C.  3729(a)(1)(A) (2010))

123.    The foregoing allegations are repeated and realleged as if fully set forth herein.

124.    The United States seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (2010).

125.    As set forth above, in connection with the foregoing schemes, Defendants knowingly, or with reckless disregard for the truth, presented and/or caused to be presented false or fraudulent claims for payment to federal agencies and/or entities that were the recipients of federal funds.

126.     By reason of these false claims, the United Stats has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## SECOND CLAIM

### Violations of the False Claims Act: Making or Using a False Record or Statement
### (31 U.S.C.  3729(a)(1)(B) (2010))

127.     The foregoing allegations are repeated and realleged as if fully set forth herein.

128.     The United States seeks relief against Defendants under Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2010).

129.     As set forth above, in connection with the foregoing schemes, Defendants knowingly, or in reckless disregard of the truth, made, used, and caused to be made and used false records and statements material to false or fraudulent claims.

130.     By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## THIRD CLAIM

### Reverse False Claims
### (31 U.S.C.  3729(a)(1)(G) (2010)

131.     The foregoing allegations are repeated and realleged as if fully set forth herein.

132.     Section 6402(a) of the Patient Protection and Affordable Care Act ("ACA"), passed March 1, 2010, requires providers to report and return overpayments of Medicaid funds within 60 days after the overpayment is identified.  H.R. 3590, 111th Cong.

§ 6402(a).  An "overpayment" under that statute includes funds received from Government Programs pursuant to which the recipient was not entitled.  *Id.*  The ACA also makes it a violation of the FCA, as a "reverse false claim," to fail to return the overpayment.  *Id.*

133.    Although Defendants were aware of extensive issues with their billing for reimbursements from Government Programs, not only did they fail to take prospective action to stem the submission of fraudulent bills, they also failed to make timely refunds of overpayments.

134.    By reason of the foregoing, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## FOURTH CLAIM

### New York False Claims Act
### (N.Y. Fin. Law §§ 187 *et seq.*)

135.    The foregoing allegations are repeated and realleged as if fully set forth herein.

136.    Relator seeks relief against Defendants pursuant to the NYSFCA, N.Y. FIN. LAW, §§ 187 *et seq.*

137.    As set forth above, in connection with the foregoing schemes, Defendants knowingly, or with reckless disregard for the truth, presented and/or caused to be presented false or fraudulent claims for payment to the Government, Government agencies and/or entities that were recipients of Government funds.

138.    By reason of the foregoing, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to damages and penalties as

required by law for each violation.

WHEREFORE, Relator, on behalf of himself as well as the United States and the State of New York, requests the following relief:

a. A judgment against Defendants in an amount equal to all damages due to the Government, including treble damages, pursuant to the FCA and/or NYSFCA;

b. A judgment against Defendants for all civil penalties due to the Government for each of Defendants' violations of the FCA and/or NYSFCA;

c. That Relator recover all costs of this action, with interest, including the cost to the Government for its expenses related to this action;

d. That Relator be awarded all reasonable attorneys' fees in bringing this action;

e. That in the event the United States Government proceeds with this action, Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

f. That in the event the United States Government does not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

g. An award to Relator on his retaliation claims including double back pay; interest on back pay; an award of front pay; special damages; an injunction restraining further retaliation; reinstatement of Relator's position; reinstatement of full fringe benefits and seniority rights; compensation for lost wages, benefits and seniority rights; and wages, benefits and other remuneration;

h. That a trial by jury be held on all issues so triable;

i. An award of pre-judgment interest; and

j. Such other relief to Relator and/or the United States of America and/or the State of New York as this Court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Dated:    February 19, 2014

                                   THOMAS & SOLOMON LLP

                          By:     _____
                                   J. Nelson Thomas, Esq.
                                   Michael J. Lingle, Esq.
                                   Jonathan W. Ferris, Esq.
                                   *Attorneys for Relator*
                                   693 East Ave
                                   Rochester, New York 14607
                                   Telephone:  (585) 272-0540